UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

SANDRA O'BRIEN,                    )
                                   )
        Plaintiff                  )
                                   )
v.                                 )   1:11-cv-00193-NT
                                   )
SOCIAL SECURITY ADMINISTRATION     )
COMMISSIONER,                      )
                                   )
        Defendant                  )

**REPORT AND RECOMMENDED DECISION**

The Social Security Administration found that Sandra O'Brien, presently age 57, has the severe impairment of bilateral Achilles tendonitis, but retains the functional capacity to perform substantial gainful activity as a telemarketer, work she has performed in the past, resulting in a denial of O'Brien's application for disability insurance and supplemental security income benefits under Title II and Title XVI of the Social Security Act. O'Brien commenced this civil action to obtain judicial review of the final administrative decision. I recommend that the Court remand for further proceedings.

**THE ADMINISTRATIVE FINDINGS**

The Commissioner's final decision is the December 17, 2010, decision of Administrative Law Judge John Edwards because the Decision Review Board did not complete its review during the time allowed. The ALJ's decision tracks the familiar five-step sequential evaluation process for analyzing social security disability claims, 20 C.F.R. §§ 404.1520, 416.920. (Docs. Related to Admin. Process, R. 1-18, Doc. No. 8-2.[1])

O'Brien meets the insured status requirements of Title II through December 31, 2013. At

---

[1] The Commissioner has consecutively paginated the entire administrative record ("R."), which has been filed on the Court's electronic docket in a series of attachments to docket entry 8.

step 1, the ALJ found that O'Brien has not engaged in substantial gainful activity since December 31, 2008, the amended date of alleged onset of disability. (R. 10, ¶ 2.) At step 2, the ALJ found that O'Brien has only one severe impairment: bilateral Achilles tendonitis. (R. 10, ¶ 3.) The ALJ concluded that a number of other health conditions did not rise to the level of being severe impairments for social security purposes, among these: fibromyalgia-like symptoms, irritable bowel syndrome, affective and anxiety-related disorders, post-traumatic stress disorder, and attention deficit hyperactivity disorder. (R. 10-13.) At step 3, the ALJ found that O'Brien's tendonitis would not meet or equal any listing in the Commissioner's Listing of Impairments, Appendix 1 to 20 C.F.R. Part 404, Subpart P. (R. 13, ¶ 4.)

Prior to further evaluation at steps 4 and 5, the ALJ assessed O'Brien's residual functional capacity. The ALJ found that O'Brien's tendonitis restricts her to sedentary work, sitting for up to 6 hours and standing or walking for up to six hours in an 8-hour workday. (R. 13, ¶ 5.) At step 4, the ALJ found that this degree of limitation left O'Brien capable of returning to past relevant work as a telemarketer, as generally performed, because, in the ALJ's words, the RFC finding left O'Brien capable of performing the entire range of sedentary work.[2] (R. 17, ¶ 6.) Consequently, the ALJ found O'Brien not disabled for purposes of the Social Security Act. (R. 17, ¶ 7.)

## DISCUSSION OF PLAINTIFF'S STATEMENT OF ERRORS

O'Brien argues that the ALJ erred at step 2 by finding her irritable bowel syndrome, fibromyalgia symptoms, and assorted mental conditions to be non-severe. (Statement of Errors at 2-3.) O'Brien further argues that the ALJ turned the treating source rule on its head because he gave little or no weight to treatment provider opinions concerning residual functional

---

[2] The ALJ did not call a vocational expert at the hearing, though the transcript notes that a vocational expert was present.

capacity. O'Brien asserts that the ALJ should have given their views some weight, even if he did not give them controlling weight. (Id. at 4-5, citing Social Security Ruling 96-2p.) She observes that the consulting, non-examining physician assessed the least restrictions, while a consulting, examining physician (Dr. Axelman, Exs. 27F and 28F) assessed moderate restrictions and the treating physicians assessed the greatest restrictions, "yet the ALJ gave the greatest weight to the non-treating, non-examining sources." (Id. at 6.) O'Brien maintains that the opinions of her care providers conclusively demonstrate that she lacks the capacity to do sustained work activity on a regular and continuing basis. (Id.)

**A.     Applicable Standards**

The Court must affirm the administrative decision so long as it applies the correct legal standards and is supported by substantial evidence. This is so even if the record contains evidence capable of supporting an alternative outcome. Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam); Rodriguez Pagan v. Sec'y of HHS, 819 F.2d 1, 3 (1st Cir. 1987). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a finding. Richardson v. Perales, 402 U.S. 389, 401 (1971); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). "The ALJ's findings of fact are conclusive when supported by substantial evidence, but they are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

At step 2, the Commissioner must consider the severity of a claimant's impairments and it is the claimant's burden to prove the existence of a severe, medically determinable, physical or mental impairment or severe combination of impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The claimant's burden at step 2 is a *de minimis* burden, designed simply to

screen out groundless claims. McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1123 (1st Cir. 1986). When a claimant produces evidence of an impairment, the Commissioner may make a determination at step 2 that the impairment is not severe only when the medical evidence "establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered." Id. at 1124 (quoting Social Security Ruling 85-28). At step 2, only medical evidence may be used to support a finding that an impairment is severe. 20 C.F.R. §§ 404.1528, 416.928.

> No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

Social Security Ruling 96-7p, 1996 SSR LEXIS 4, *1, 1996 WL 374186, *1. "Symptoms are [a claimant's] own description of [his or her] physical or mental impairment." 20 C.F.R. §§ 404.1528(a), 416.928(a). A claimant's "statements alone are not enough to establish that there is a physical or mental impairment." Id. By contrast: "Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques." Id. §§ 404.1528(b), 416.928(b).

Because the claimant bears the burden of proof through step 4, including the burden to demonstrate the degree of functional limitation resulting from her impairments, an error in describing a given impairment as non-severe at step 2 is considered "harmless," unless the claimant can demonstrate that the error proved outcome determinative in connection with her residual functional capacity. Bolduc v. Astrue, No. 09-cv-220-B-W, 2010 WL 276280, at *4 n.3,

4

2009 U.S. Dist. Lexis 122049, *10 n.3, aff'd, 2010 U.S. Dist. Lexis 4005 (D. Me. Jan. 19, 2010) (citing cases). This is typically accomplished by showing that there is evidence the omitted impairment limits the claimant's residual functional capacity in a way, or to a degree, not already accounted for in the ALJ's RFC finding.

**B.      Material Findings and Diagnoses**

O'Brien filed her claims in November 2008, alleging disability starting October 2008. In January and February of 2009, consulting physicians J. H. Hall, M.D., and David Houston, Ph.D., respectively, assessed that there was no evidence of *any* severe physical or mental impairment. (Med. Records Part 1, Exs. 5F, 6F, Doc. No. 8-7.) Thereafter, Penobscot Community Health Center records from October 2007 through March 2009 (Ex. 7F) were added to the record. These mostly reflect persistent reflux, diarrhea, and urinary urgency. They also include reference to some symptoms of depression and anxiety, but this appears to be associated with contemporaneous stressors and life changes. (R. 351.) Consulting physician Brenda Sawyer, Ph.D., reviewed these records and assessed that they did not establish the existence of a medically determinable mental impairment, but flagged the presence of "coexisting nonmental impairment(s) that requires referral to another medical specialty." (Ex. 8F, R. 371.) Consequently, in August 2009, consulting physician Donald Trumbull reviewed these records and assessed that they did not support a finding of an exertional impairment or other work-related impairment for social security purposes. (Ex. 9F.) A review of the comments associated with these review forms reflects that the physicians did not identify any tendonitis diagnosis or a fibromyalgia diagnosis in these records.

On August 28, 2009, and on September 15, 2009, respectively, Eastern Maine Medical Center treated O'Brien in its orthotics department and obtained radiologic imaging of O'Brien's

lower extremities. The related reports identify bilateral Achilles tendonitis as a serious concern requiring custom orthotics. (Exs. 11F, 12F.) The tendonitis is discussed and elaborated upon in records produced by podiatrist Keith Kendall, DPM. (Ex. 29F.) The ALJ found this condition to be severe and his assessment of the limitations it imposes is not specifically challenged by O'Brien in her Statement of Errors.

Meanwhile, in late September 2009, O'Brien obtained a referral for psychiatric consultation with Thomas Rusk, M.D., also of Penobscot Community Health Center. (Med. Records Part 2, Ex. 13F, Doc. No. 8-8.) This referral culminates in a diagnosis from Dr. Rusk of ADHD Inattentive Type, Mood Disorder NOS and Anxiety Disorder NOS. (R. 404.) Dr. Rusk's notes relate O'Brien's preoccupation with her effort to obtain social security benefits, but also describe what he calls a disability resulting from the "overwhelming cumulative 'allostatic load'—the breakdown of mental and physical health due to cumulative stress of childhood neglect, trauma and decades of work that have overwhelmed her mind, body and spirit's ability to maintain their integrity and well-being." (Id.) Despite the "allostatic load" finding, associated records indicate that there is no need for medications to treat O'Brien's anxiety or depression, but that there was a need for some counseling. Ritalin was prescribed to address ADHD symptoms and much of the content in the counseling notes addresses the management of ADHD symptoms through medication, though there is also some self-esteem counseling. (Id., R. 408, 416; Ex. 14F.) Counseling therapies have also been provided by Elizabeth Pelissier APRN, BC, and Emily Barrington LCPC. (Ex. 14F, *e.g.*, R. 456, 470-80; Ex. 16F.) Dr. Rusk has endorsed diagnoses of depression, anxiety, and ADHD, as well as a prescription of Ritalin. (R. 458-462, 490, 492-93; Ex. 21F, R. 527-29.)

The collection of medical records associated with the mental health diagnoses also includes records associated with a fibromyalgia assessment by Kendra LeBreton, PA-C, in July 2009 and by Kathleen Bowen, FNP, in June 2009. (Ex. 13F, R. 416.) O'Brien reportedly receives some benefit from a prescription of Lyrica for various athralgias and PA LeBreton has the impression that fibromyalgia is present, though she notes under the diagnosis that O'Brien reports having trouble "getting disability." (R. 416, 421-422, 425.) Celebrex is also prescribed. (Med. Records Part 3, Ex. 17F, R. 511, Doc. No. 8-9.)

PA LeBreton completed a physical impairment questionnaire for social security purposes in May 2010. (Ex. 18F.) According to LeBreton, O'Brien is capable of low stress jobs, can walk only a city block before requiring rest, can sit for more than 2 hours at one time, and can stand for only 20 minutes at a time. (R. 513.) Additionally, LeBreton opines that O'Brien can sit for a total of 4 hours in an 8-hour work day, and stand/walk for about 2 hours, but also must periodically walk during the day and have a 15-30 minute break every two hours. (R. 514.) LeBreton also assesses a less than 10 pound weight capacity. (Id.) Additionally, she says there is no reaching, handling, or fingering restriction, but that LeBreton would miss more than 4 days per month due to her impairments and periodic "bad days." (R. 515.)

Dr. Rusk completed a mental impairment questionnaire in August 2010. (Ex. 19F.) Dr. Rusk indicates that he has diagnosed O'Brien's with ADHD and mood disorder. He indicates that ADHD imposes serious limitations on O'Brien in relation to unskilled work, including in the work-related areas of remembering procedures, maintaining attention for two-hour segments, maintaining attendance and punctuality, completing a normal work day or week without interruptions from psychological symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. (Ex. 19F, R. 519.) Dr. Rusk's explanatory

7

notes indicate that it is ADHD that causes these mental limitations and also that O'Brien's ADHD prognosis is "fair to good with treatment." (R. 517, 519.)

The record also reflects a referral for rheumatologic evaluation. In August 2010, Dr. Fadi Ajine, M.D., endorsed findings by Marci Lowe ARNP that O'Brien suffers from fibromyalgia. (Ex. 22F, R. 560; Ex. 30F.)

In September 2010, Donna Gates, Ph.D., conducted a consultative examination for Maine Disability Determination Services. (Ex. 25F.) Dr. Gates diagnosed a personality disorder NOS, but did not offer a diagnosis in support of an affective or anxiety disorder. (R. 583.) Dr. Gates's source statement indicates:

> Ms. O'Brien reported that she was always employed until she stopped working due to physical functioning. She has no apparent clinically significant mental health issues. She likely could work if she was physically able to do so. Based on the available information, it appears that she is capable of following work rules. She likely can relate adequately to coworkers, supervisors, and the public. Judgment is expected to be adequate for jobs within her vocational ability. She likely can manage a mild level of work -related stress and function independently on simple jobs. She can maintain her personal appearance and behavior in emotionally stable manner. Any limitations based on her physical disability are deferred to the evaluating physician.

(Id.) Based on this Dr. Gates also offered a medical assessment of mental ability to perform work-related activities. (Ex. 26F.) Essentially she sees only mild limitations, except insofar as complex instructions and tasks are concerned. (R. 585.) Dr. Gates notes that O'Brien has sustained employment for 27 years and has had numerous part-time jobs. Dr. Gates opined that there was no apparent change in mental status since the time when O'Brien was employed. (R. 586.)

In October 2010, Maine Disability Determination Services sought a consultative physical examination by David Axelman, MD. (Ex. 27F.) Dr. Axelman also provided a medical source statement related to O'Brien's ability to perform work-related activities. (Ex. 28F.) Dr.

Axelman sees O'Brien's residual functional capacity as more limited than the ALJ found, in a variety of ways, such as reduced durations for standing and sitting. (R. 594.) He agrees with the fibromyalgia diagnosis and says "she is quite symptomatic to minimal touch." (R. 592.) However, he also indicates that "the main difficulty is the pain from her knees and feet from the Achilles tendinosis as well as the arthritic problems with her feet." (Id.)

John Patten, D.O., also of Penobscot Community Health Care, completed a physical RFC questionnaire in November 2010. He endorsed the fibromyalgia diagnosis, noting: "multiple FMS trigger points, somatic dysfunction cervical, thoracic, rib, lumbar, sacrum & pelvis." (Med. Records Part 4, Ex. 33F, R. 641.)

The last relevant document in the medical records is a letter from Dr. Rusk, reiterating his findings. (Ex. 35F.) In his letter, Dr. Rusk states that ADHD symptoms have improved since August 2010 with increased doses of methylphenidate, but that O'Brien has unfortunately experienced worsening symptoms related to "her musculoskeletal condition." (R. 656.)

In addition to this evidence, the ALJ called Peter Webber, M.D., to testify at O'Brien's hearing. When asked to identify the medically determinable impairments that O'Brien suffers from, Dr. Webber described fibromyalgia as "one of the primary issues." (R. 51.) Thereafter, he queried O'Brien about who had seen her at Dr. Ajine's practice. O'Brien responded that she had only seen Marci Lowe, and not Dr. Ajine. (R. 52.) Dr. Webber observed the possibility that Dr. Ajine reviewed NP Lowe's findings and impressions, but said it was "a concern" that he might not have "double check[ed] the physical examination himself on the high point of the positive findings." (R. 53.) At that point the ALJ briefly changed the direction of the questioning to address the Listings, but then returned to the fibromyalgia question. (Id.) The transcript is insufficient to determine what Dr. Webber said at this point. It appears that he believed

9

fibromyalgia was a severe condition, but allowed that there might be room to argue whether the diagnosis came from a medically acceptable source. (R. 54.) The ALJ expressed the view that "I think my legal ruling has to be that the diagnosis has not been established by [INAUDIBLE]. Dr. [INAUDIBLE] [presumably Ajine] has not examined Ms. O'Brien." (Id.) On further questioning by counsel about findings made by Dr. Patten (Ex. 33F), Dr. Webber expressed the view that Dr. Patten had never offered any diagnosis in the treatment record specific to fibromyalgia, but that his findings "are probably consistent with some form of myalgia." (R. 56.) Asked to consider Dr. Axelman's findings, Dr. Webber said that Dr. Axelman indicated wincing and reaction to "very light touch," which Dr. Webber described as "questionable as far as establishing diagnosis." (R. 58.)

C.  **Mental Health Impairment at Step 2**

O'Brien argues that the step 2 findings should have included attention deficit hyperactivity disorder, post-traumatic stress disorder, depression, and anxiety. (Statement of Errors at 2-3.) The ALJ, however, found that the evidence did not support a finding of any severe mental impairment. The ALJ provides an extensive discussion of the question in his decision and it might well contribute to a finding of substantial evidence were it not for the fact that Dr. Gates assessed a restriction to simple, low stress work based on a personality disorder, even if she concluded that the other diagnoses did not divulge severe conditions. In light of Dr. Gates's medical source statement, the record does not support the finding that O'Brien can perform the entire range of sedentary work, which was the stated basis for the ALJ's finding that O'Brien can return to her past work as a telemarketer. According to the Dictionary of Occupational Titles, section 299.357-014, the telemarketer job is reasoning level 3, which exceeds this District's assessment of what constitutes "simple" unskilled work. Little v. SSA

Comm'r, No. 1:10-cv-96-JAW, 2010 U.S. Dist. Lexis 136295, *4-8, 2010 WL 5367015, *3 (D. Me. Dec. 21, 2010) (Kravchuk, Mag. J., Rec. Dec.) (adopted in the absence of objection); Pepin v. Astrue, No. 2:09-cv-464-GZS, 2010 U.S. Dist. Lexis 98294, 2010 WL 3361841 (D. Me. Aug. 24, 2010) (Rich, Mag. J., Rec. Dec.) (same).

**D.  Physical Impairment at Step 2**

O'Brien argues that the step 2 findings also erroneously excluded fibromyalgia and irritable bowel syndrome. Based on my review of the record, abstracted above, I conclude that the ALJ erred in finding that a chronic myalgic impairment was not a medically determinable impairment at step 2.

*1. Fibromyalgia*

The ALJ assessed fibromyalgia at step 2 with the following discussion:

> While the claimant has received osteopathic manipulation and been prescribed Savella and Amitriptyline and was diagnosed with fibromyalgia due complaints of generalized muscle and joint pain with diffuse tenderness (Exhibits 13F, 17F, 18F, 21F, 22F, 27F, 30F, 32F, 33F, and 34F), this diagnosis appears to have been made by a physician's assistant, which is not an acceptable medical source for the purposes of establishing the existence of a medically determinable impairment. Only eight trigger points were noted on March 11, 2009 (Exhibit 13F), and medical records fail to document limitation of motion, joint deformity or instability, synovitis, effusion, muscle spasms, atrophy, decreased strength, scoliosis, or motor, sensory, or reflex loss (Exhibits 7F, 13F, 22F, 27F, 30F, and 32F).

(R. 12.) Subsequently, in his residual functional capacity discussion, the ALJ made it clear that he did not factor in symptoms of fibromyalgia, or even myalgias, stating: "The impartial medical expert also noted that the diagnosis of fibromyalgia was made by a nurse practitioner, which is not an acceptable medical source." (R. 14.)

I conclude that it was error to treat O'Brien's myalgic condition as not medically determinable at step 2 based on this record, which includes: a fibromyalgia diagnosis by ARNP

11

Lowe, with Dr. Ajine's endorsement; a concurring diagnosis by Dr. Patten, based on a long-term treatment history and what appear to be independent findings; an assessment by Dr. Axelman that the condition is established, also including some independent findings upon examination; and a concession by Dr. Webber that fibromyalgia is the primary concern of record, even if he later limited the impairment to "some form of myalgia." Furthermore, because Dr. Webber did not address the question of residual functional capacity and all of the remaining medical experts assessed a greater degree of functional limitation than the ALJ, I agree with O'Brien that the record demonstrates an error that is material for purposes of the ALJ's residual functional capacity assessment.

I recognize that ALJs are concerned about conditions like fibromyalgia, which are difficult to diagnose and call into question the line between medical "signs" and subjective "symptoms." In this particular case, Dr. Webber might have supplied the testimony needed to make a determination at step 2 of the process, but the quality of his testimony does not lend appreciable weight to the ALJ's decision. Thus, even though the ALJ issued a carefully crafted decision, replete with negative credibility evaluation, his strict step 2 finding is not supported by substantial evidence in the form of a medical opinion stating that the "signs" in the record do not warrant the fibromyalgia diagnosis. Additionally, there is no expert physical RFC assessment for the Commissioner to fall back on that treats the myalgic condition as severe while offering a RFC assessment like the one crafted by the ALJ.[3] Consequently, the error is material to the

---

[3] Dr. Webber did not offer testimony related to the ALJ's finding that "only eight trigger points were noted" or that the records "fail to document limitation of motion, joint deformity or instability, synovitis, effusion, muscle spasms, atrophy, decreased strength, scoliosis, or motor, sensory, or reflex loss." (R. 12.) Perhaps these are the signs of a true fibromyalgia syndrome, but the Commissioner has not identified any expert opinion of record to that effect and his lay assessment does not suffice on its own. The First Circuit has referenced medical dictionaries to describe the fibromyalgia syndrome and diagnostic criteria established by the American College of Rheumatology, but the First Circuit has not itself pronounced a minimal "legal" standard for the diagnosis of fibromyalgia. See Johnson v. Astrue, 597 F.3d 409, 410-11 (1st Cir. 2009) (*per curiam*). Nor has the Commissioner identified any regulatory guideline or

outcome and warrants a remand.

   2. *Irritable Bowel Syndrome*

   As for irritable bowel syndrome, the ALJ made the following finding:

   Although the clamant has reported a history of diarrhea and irritable bowel
   syndrome (Exhibits IF,7F, 13F, 17F, 18F, 32F, 33F, 34F, and Testimony),
   medical records fail to document a formal diagnosis of or ongoing treatment for
   such an impairment.

(R. 13.) For a formal diagnosis, O'Brien cites the record at page 641. The document in question is the physical RFC questionnaire completed by Dr. Patten. In it, Dr. Patten includes IBS as a relevant diagnosis and describes "chronic diarrhea," but fails to identify related signs or findings. In the absence of findings, there are only reports of subjective symptoms, which do not suffice for step 2 purposes. In this particular presentation, I conclude that the record contains substantial evidence supporting the ALJ's determination. The supportive evidence is in the form of the physical RFC assessments offered by Dr. Hall (5F) and Dr. Trumbull (9F), both of whom reviewed the medical records associated with these reported symptoms and found the condition non-severe for social security disability-related purposes; the consultative examination report completed by Dr. Axelman (Ex. 27F), who did not identify the condition as part of O'Brien's relevant medical history or as an impairment material to the disability assessment and noted O'Brien's ability to use public transportation; and evidence indicating that O'Brien was able to maintain employment in the past despite this condition.

---

ruling specific to the fibromyalgia syndrome that would supply diagnostic standards for an administrative
law judge to apply in the absence of guidance from a medical expert.

## CONCLUSION

For the reasons set forth in the foregoing discussion, I RECOMMEND that the Court remand the Commissioner's final decision for further proceedings consistent with the foregoing discussion.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

March 23, 2012